UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EUGENE WEISSBERGER,<br><br>*Plaintiff*,<br><br>v.<br><br>ZAGG, INC.,<br><br>*Defendants*. | **JURY TRIAL DEMANDED** |

# COMPLAINT

Eugene Weissberger ("Plaintiff" or "Weissberger"), by his attorneys Blank Rome LLP, brings this complaint against ZAGG, Inc. ("ZAGG" or "Defendant"), and alleges as follows:

## Nature of the Action

1. ZAGG is a privately held company that manufactures smartphone screen protectors and other mobile accessories, with annual revenues of nearly $500 million. Weissberger is a highly experienced financial professional with over 15 years of debt financing experience who currently runs the Debt Advisory Group at a large, Chicago-based investment bank.

2. In June of 2021, ███████████████████████████████████████████████████████████████████████████████████████████████████████████ Evercel Inc. ("Evercel")—the publicly traded investment firm that is a majority owner of ZAGG. ███████████████████████████████████████████

3. High-stakes debt refinancing is a highly specialized field, and the market for debt advisory services reflects that. Debt advisors are the professionals who create the financial models and marketing materials that help companies and potential lenders assess deals and finalize terms.

In February 2020, ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

4.      Unable to secure the services of its prior advisor given the significant capacity constraints present in the debt advisory market in June 2021, ■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■, ZAGG turned to Weissberger for assistance.

5.      ZAGG originally pitched the engagement to Weissberger as one that would be relatively straightforward—with most documents merely needing to be updated from ZAGG's last round of financing—albeit one that needed to close within a short timeframe given ZAGG's tenuous status with its existing lender.

6.      Almost immediately, however, the scope of the project ballooned as ZAGG's potential lenders dropped out and the financial models provided were inaccurate and unusable. As a result, Weissberger had to line up new lenders, and hire help to assist in creating a new financial model and other items from scratch.

7.      ZAGG always promised to pay Weissberger, as ZAGG's representatives initially suggested a ■■■■■■■■■■■■■■■■■. Weissberger repeatedly rejected it as too low—and far too low once the larger-than-advertised scope of the project became clear to all and he was asked to hire additional help. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■, Weissberger and ZAGG agreed to move forward with the work and determine a fair fee (commensurate with the work Weissberger was asked to perform and the benefit ZAGG anticipated receiving) later.

8.      Weissberger was clear, however, that ZAGG's lowball offer was not enough, and the fee would have to reflect the market value of his time and expertise. To that end, shortly after

Weissberger began working on the engagement he proposed ▇▇▇▇▇▇▇▇ in connection with his debt advisory services, contingent on the successful closing of a deal. ZAGG rejected Weissberger's fee proposal, however, it requested that Weissberger continue working on the transaction understanding that Weissberger's fee was still an open item and based on the representation the parties would discuss and agree to an fee that was reasonable and commensurate with the significant work Weissberger was performing and the substantial benefit ZAGG expected receive.

9. As the workflow continued to balloon well beyond what was initially represented, Weissberger called ZAGG to again reiterate his view that ZAGG's initial offer was not market and far too low, and to attempt to reach agreement on a reasonable fee, as he was promised. ZAGG refused engage in a good faith discussion and instructed Weissberger to stop working on the engagement.

10. Facing the prospect of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and armed with the knowledge of what Weissberger believed was a fair fee for the debt advisory services he was performing, ZAGG's representative reached out to Weissberger only thirty (30) minutes later and withdrew their instruction to stop working.

11. During that telephone call ZAGG's representatives further induced Weissberger to continue providing debt advisory services to ZAGG by affirmatively representing that ZAGG would pay him a fee commensurate with the significant work he was performing and the significant benefit ZAGG would receive, *in excess of* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

12. While promising to pay him ▬▬▬▬▬▬▬▬▬▬ and commensurate with the work he was performing, ZAGG's representatives did not specify a specific amount, and again promised Weissberger the parties to work in good faith to resolve the fee issue.

13. In reliance on the representations of ZAGG's leadership, Weissberger agreed to continue working on the debt advisory engagement.

14. After working nonstop for weeks (sacrificing virtually all other professional and personal commitments), Weissberger helped ZAGG successfully close its debt refinancing deal with a new lender on July 19, 2021.

15. In addition to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬) the deal is projected to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

16. ZAGG's representatives were delighted with the outcome, and repeatedly told Weissberger his work had been "invaluable" and "tremendous".

17. When Weissberger inquired about his fee upon the closing of the deal, however, ZAGG changed its tune. Despite having known all along that Weissberger had not agreed to ▬▬▬▬▬▬▬▬▬▬ and disregarding its repeated representations to engage in good faith negotiations concerning a fee commensurate with the work being performed and the benefit being received (a fee that ZAGG expressly represented to Weissberger would be ▬▬▬▬▬▬▬▬▬▬), ZAGG's representatives insisted ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, telling Weissberger to take it or leave it. To date, ZAGG has paid Weissberger nothing.

18. The services Weissberger provided to ZAGG have a market value of ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬. ZAGG knew that when it asked Weissberger to provide those services, when it

accepted the services from him and when it promised to pay Weissberger an appropriate fee ▮ ▮▮▮▮▮▮▮▮▮▮▮▮. ZAGG has benefited enormously from Weissberger's services, and is unjustly enriched by retaining the fee that Weissberger rightfully earned. Weissberger accordingly brings this suit, asking to be paid the fair value of the work he performed for ZAGG, estimated at ▮▮▮▮▮▮▮▮▮▮▮▮▮.

## Parties

19. Weissberger is a citizen of Illinois who resides in Illinois.

20. ZAGG, Inc. is a Delaware corporation with its primary place of business in Midvale, Utah.

## Jurisdiction and Venue

21. This is an action between citizens of different states. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332(a) based upon diversity of citizenship. The amount in controversy exceeds $75,000, exclusive of fees and costs.

22. This Court has specific personal jurisdiction over ZAGG because ZAGG deliberately solicited Weissberger in Illinois to provide services in Illinois, and knowingly caused harm to Weissberger in Illinois when it refused to pay him a reasonable fee.

23. This Court also has general personal jurisdiction over ZAGG because ZAGG does substantial business in Illinois and advertises its products to Illinois citizens.

24. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the controversy occurred within the Northern District of Illinois's Eastern Division.

**Factual Allegations**

*ZAGG Solicits Weissberger For Debt Advisory Services*

25.  As of June 2021, Weissberger had recently accepted a position as Managing Director and Head of Debt Advisory in the investment banking group of a Chicago-based financial services firm. On or about June 4, 2021, an intermediary reached out to Weissberger to inform him of the possibility of a short-term debt advisory engagement for ZAGG.

26.  On or about June 4, 2021, Weissberger spoke by phone with Daniel Allen ("Allen"), a director of ZAGG and CEO of Evercel, to discuss ZAGG's financing needs and the potential for Weissberger to assist with debt advisory services.

27.  On or about June 6, 2021, Weissberger spoke by phone with Allen and Matthew Sevick ("Sevick"), also a director of ZAGG and an owner of Evercel, to better understand the ZAGG project and Weissberger's potential role.

28.  At all times referenced herein Allen and Sevick were acting (in part) as authorized representatives of ZAGG.

29.  During the June 6 call, speaking on behalf of ZAGG, Allen and Sevick described a project of relatively limited scope. They informed Weissberger that ███████████ ████████████████████████████████████████████████████████████ ██████████████████████████ They also represented to Weissberger that ZAGG had several potential lenders already lined up from its financing several months earlier, and that Weissberger's role in connection with the debt refinancing would be updating those existing proposals and financial models, rather than creating extensive new ones.

30.  ████████████████████████████████████████████████████████████ ██████████████████████████ Allen and Sevick were clear that the deal

6

would need to close in approximately six weeks in order to meet ZAGG's needs—███████████████████████████████.

31. While Weissberger's compensation was not specifically addressed during the June 6 call, Sevick generally mentioned that ZAGG would gladly pay ███████ to get a deal in line with their current term loan for which default was being alleged. Weissberger never agreed to any fee and he indicated that he needed to better understand the scope of the work before an actual conversation concerning his compensation could occur. At the conclusion of that call, no agreement concerning Weissberger's fee had been reached. The parties agreed to table the discussion concerning a fee to a future date.

32. Weissberger agreed to take the project despite the fact that the amount of his fee had not been agreed to and based on the understanding that good faith discussions concerning his compensation would take place in the near term. He made Allen and Sevick aware the next day, June 7, that he was postponing the start date of his new job in order to do so.

33. In addition, on June 7 Sevick advised Weissberger (for the first time) that due to bandwidth constraints, ZAGG would not be able to provide the customary resources that a company would be expected to provide its debt advisor in connection with a proposed transaction. Accordingly, Sevick expressly suggested that Weissberger hire additional support to assist him

34. In addition, on or about that time Weissberger discovered that the models ZAGG had provided to him from its recent debt transaction, and which ZAGG represented could be used in connection with Weissberger's services, were actually useless. This further required Weissberger to seek additional support to assist him.

*Weissberger Provides Debt Advisory Services To ZAGG*

35. Within days of Weissberger starting to work on the ZAGG refinancing, it became clear that ZAGG would require far more from Weissberger than Allen and Sevick originally represented, while the compressed time schedule remained.

36. For example, in addition to the useless models referenced above, the lender candidates that had supposedly been interested in the transaction that closed in February quickly dropped out, meaning: (1) ZAGG was scrambling for new potential lenders; and (2) much of the work completed on the previous transaction was not in a form acceptable to the new lenders Weissberger would need to approach on behalf of ZAGG, and therefore would need to be recreated by Weissberger.

37. Weissberger utilized his network to help find ZAGG a new lender. This included ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

38. On or about June 15, 2021, Weissberger reached out to Allen and Sevick in an effort to reach an agreement concerning his compensation—especially given the expanded scope of work requested by ZAGG. At that time Weissberger expressly rejected Allen and Sevick's suggestion that ZAGG would pay him ███████ for his services. At that time Weissberger proposed a fee ███████ in connection with his services – contingent on the successful closing of a refinancing by ZAGG.

8

39. Weissberger made clear to ZAGG that his proposed fee was reasonable and in line with the market, in light of the significant work he was performing for ZAGG (including the expanded scope of the work in a compressed time period), the fact that he needed to hire an additional resource to assist with the work and the expected benefit ZAGG would receive if successful.

40. Several days later ZAGG rejected Weissberger's fee proposal. ZAGG's need for Weissberger to continue working to get a deal closed still remained. Accordingly, in an effort to keep Weissberger working, ZAGG represented that it would engage in good faith negotiations with Weissberger concerning his fee, taking into account the work he was performing, and the expected benefit to ZAGG.

41. Relying in those representations, Weissberger agreed to keep working diligently on ZAGG's refinancing and resolve the compensation question later. He did so based on Allen and Sevick's representations—already knowing that ███████████ was too low, even for the original scope of work—that the parties would satisfactorily address the compensation issue at a later time. Those representations induced Weissberger to keep working on ZAGG's refinancing.

42. On or about June 29, 2021, Weissberger and Allen spoke again by phone regarding Weissberger's fee. Weissberger pointed out that his workload had expanded enormously with the increased scope of the project, and that he was working through every night and weekend in an attempt to complete the work on the timeline ZAGG needed. During this conversation, Weissberger unequivocally told Allen again ███████████ was less than fair value for the services he was being asked to provide, that he had not and would not agree to that fee, and that he would not perform further work for ZAGG for that low a fee.

43. Allen responded by instructing Weissberger to stop working on ZAGG's refinancing, and the call ended.

44. ███████████████████████████████████████████████████████████ ████████████████████████████ armed with the knowledge of what Weissberger believed was a fair fee for the debt advisory services he was performing, Allen called Weissberger back only *thirty (30) minutes later* and asked Weissberger to continue working on behalf of ZAGG.

45. In an effort to induce Weissberger to continue working, Allen advised that he understood Weissberger's rejection of ZAGG's ██████ offer and he affirmatively represented to Weissberger that ZAGG would pay him a fee commensurate with the significant work he was performing and the significant benefit ZAGG would receive, *in excess of* █████████████ ██████

46. While promising to pay him a fee in excess of ████████, Allen instructed that further conversations on the exact amount to be paid to Weissberger be "tabled" as there were "lots of fire drills" to address in connection with the debt refinancing.

47. Again Allen represented to Weissberger that the parties would engage in good faith negotiations concerning a fair fee – one that Allen expressly promised would be in excess of ██████

48. In reliance on Allen's representations on behalf of ZAGG's, Weissberger agreed to continue working on the debt advisory engagement.

49. On July 1, 2021, Weissberger sent Allen a text message confirming that he was relying on Allen's representation that the parties would come to a reasonable agreement on fee and stating yet again that ████████ was not enough. Weissberger wrote: "I hate to keep bringing this up, but I am 100% operating in good faith we will come to a reasonable agreement on fee (you

10

know my thoughts on ▇▇▇▇▇▇▇) as this is clearly not the 'reviewing some terms sheets and some model and ppt updating' that is was advertised to me as at the end of the day you are going to get one heck of a good deal out of it."

50. Allen failed to response to Weissberger's July 1 text message. That silence further lead Weissberger to believe Weissberger and ZAGG would come to a reasonable agreement on a fee based on the substantial work he was performing and the significant benefit ZAGG would receive, and that fee would be in excess of ▇▇▇▇.

***ZAGG Accepts The Benefit of Weissberger's Services But Refuses To Pay***

51. Based on the representations set forth above, between June 29, 2021 and July 19, 2021, Weissberger continued to work around the clock for the benefit of ZAGG.

52. The New Loan closed on July 19, 2021.

53. In addition to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, according to Weissberger's models, which ZAGG relied upon in choosing a lender, the New Loan was projected to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

54. Weissberger's debt advisory services were instrumental in securing the New Loan for ZAGG. When congratulating Weissberger after the deal closed, Allen told him "[y]our work was invaluable" and "tremendous."

55. On or about July 25, 2021, Allen reached out to Weissberger by email to reiterate his congratulations. In this email, Allen acknowledged that Weissberger's compensation for his critical role in ZAGG's successful refinancing remained an open issue.

11

56. In ensuing conversations, Allen and Sevick, on behalf of ZAGG, refused to offer Weissberger the market value of the services he had provided ZAGG and, in direct conflict with their prior representations, have only offered Weissberger ▇▇▇ for his debt advisory services.

57. To date, ZAGG has not paid Weissberger anything, while accepting the full benefit of his advisory services.

58. The fair market value of Weissberger's services provided to and accepted by ZAGG is approximately ▇▇▇

## Claims for Relief

### COUNT ONE
*Quantum Meruit*

59. Weissberger incorporates by reference the preceding paragraphs as though fully set forth herein.

60. As described above, Weissberger performed debt advisory services for ZAGG in connection with the New Loan.

61. ZAGG received substantial benefits from the debt advisory services performed by Weissberger. This included the refinancing of the Original Loan -- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. In addition, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, as detailed above.

62. Weissberger did not perform these debt advisory services gratuitously; indeed, Weissberger and ZAGG's representatives had multiple conversations about Weissberger's fee.

63. ZAGG accepted Weissberger's services.

64. No contract existed to prescribe payment for Weissberger's services, because Weissberger and ZAGG never agreed on the amount of Weissberger's fee.

65. Under the circumstances herein alleged, it would be unjust for ZAGG to retain the benefit of Weissberger's services without compensating Weissberger for performing those services.

## COUNT TWO
*Unjust Enrichment*

66. Weissberger incorporates by reference Paragraphs 1-58 as though fully set forth herein.

67. ZAGG has retained a significant benefit in the form of the fair market value of the debt advisory services Weissberger provided to it.

68. ZAGG's retention of this benefit is to Weissberger's detriment, as Weissberger would not have provided the services had he known that ZAGG would retain the benefit of them without paying, and Weissberger is being deprived of the benefit he expected.

69. Under the circumstances herein alleged, ZAGG's retention of the fair market value of the debt advisory services Weissberger provided to it violates the principles of justice, equity, and good conscience.

## COUNT THREE
*Fraud*

70. Weissberger incorporates by reference Paragraphs 1-58 as though fully set forth herein.

71. On information and belief, ZAGG never intended to pay Weissberger the market value of his debt advisory services in connection with the ZAGG refinancing or to negotiate a fair fee in good faith – despite repeated representations to the contrary.

72. ZAGG communicated with Weissberger through its representatives, Allen and Sevick.

13

73. On information and belief, Allen and Sevick knew that ZAGG did not intend to pay Weissberger the market value of his debt advisory services in connection with the ZAGG refinancing or to negotiate a fee for the services provided by Weissberger in good faith and commensurate with the work performed and the benefit to be received.

74. Armed with the knowledge that ▮▮▮▮ was not a satisfactory fee, on behalf of ZAGG, Allen and Sevick repeatedly represented that they would engage in good faith discussions with Weissberger throughout June of 2021 concerning a fee for debt advisory services in order to induce him to continue providing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

75. Armed with the knowledge that ▮▮▮▮ was not a satisfactory fee and that a fee of ▮▮▮▮ was more appropriate given the significant work performed by Weissberger and the substantial benefit to ZAGG, Allen falsely represented to Weissberger that ZAGG intended to pay Weissberger the market value of his debt advisory services in connection with the ZAGG refinancing, and certainly more than ▮▮▮▮

76. In particular, on a June 29, 2021 teleconference Allen indicated that he understood Weissberger's position that ▮▮▮▮ was too low. In order to induce Weissberger to continued performing debt advisory services on behalf of ZAGG, Allen expressly represented to Weissberger that ZAGG intended to pay Weissberger the market value of his debt advisory services, in excess of ▮▮▮▮, and advised that the parties would work in good faith to determine and appropriate fee based on the work Weissberger was performing and the benefit to be received by ZAGG.

77. Likewise, Allen failed to respond to Weissberger's July 1, 2021 text message concerning ZAGG's promise to pay Weissberger the market value of his services. Upon information and belief, Allen's silence was intended to further induce Weissberger to continue

performing debt advisory services for ZAGG under the believe that he would be appropriately compensated and the good faith discussions concerning his fee would occur.

78. These repeated representations were false when made, and on information and belief, were made pursuant to a scheme to defraud Weissberger by making a series of vague promises, short of an enforceable contract, that would induce Weissberger to provide debt advisory services, with the knowledge and intent that ZAGG would never engage in good faith negotiations concerning a reasonable fee commensurate with the work performed and benefit received, and would never agree to pay the fair market value of those services.

79. Allen made these representations to Weissberger on behalf of ZAGG with the intent of inducing Weissberger to provide, or to continue to provide, debt advisory services to ZAGG in connection with ZAGG's refinancing.

80. Weissberger reasonably relied on these false representations in deciding to provide, and to continue to provide, debt advisory services to ZAGG.

81. Weissberger was damaged by his reliance on ZAGG's false statements made through Allen and Sevick, because he provided valuable debt advisory services to ZAGG and has been denied fair compensation for them.

82. On information and belief, ZAGG's fraud was intentional, willful, and wanton.

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter judgment for Plaintiff and against Defendant on Counts I-III;

b. Award Plaintiff compensatory damages in an amount to be determined at trial, of at least ███████;

c. Award Plaintiff punitive damages;

d. Award pre-judgment interest in favor of Plaintiff;

e. Award Plaintiff attorneys' fees and expenses to the fullest extent allowable by law; and

f. Grant such other relief as this Court deems just and proper.

Respectfully submitted,

BLANK ROME LLP

 s/ *Andrew H. Schrag*
Andrew H. Schrag
444 W. Lake Street, Suite 1650
Chicago, Illinois 60606
(312) 776-2600
aschrag@blankrome.com

Evan H. Lechtman (*pro hac vice* forthcoming)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
(215) 569-5500
lechtman@blankrome.com

*Attorneys for Plaintiff,
Eugene Weissberger*

16